## WILLIAM THOMPSON v. STATE.

No. A-3430.    Opinion Filed June 11, 1921.
(198 Pac. 517.)

(Syllabus.)

**Larceny—Evidence Insufficient.** In a prosecution for the larceny of a hog, evidence held insufficient to sustain a conviction.

Appeal from District Court, Cherokee County; John H. Pitchford, Judge.

William Thompson was convicted of larceny of a hog, and he appeals.    Reversed.

J. J. Bruce, for plaintiff in error.

The Attorney General and W. C. Hall, Asst. Atty. Gen., for the State.

DOYLE, P. J.    Plaintiff in error, William Thompson, was convicted in the district court of Cherokee county on an information charging the theft of a black and white spotted sow, the property of D. S. Whitmore, and in accordance with the verdict of the jury was sentenced to be imprisoned in the penitentiary for the term of two years.    To reverse the judgment he appeals.

In order to present the assignments we will briefly state the testimony in the case.

D. S. Whitmore testified:

"In October, 1917, the defendant lived a mile south and a mile and a half west of me.    I was the owner of a certain black and white spotted sow, marked with a smooth crop and two splits in each ear.    She was one of 13 head of feeders that I turned on the range two miles west of where I lived in April, about roasting ear time I missed three hogs.    I found this sow in Thompson's pen.    This sow would have been a year old last August."

On cross-examination the following questions were asked and answers given:

"Do you know whether this hog has any white spots on it? I cannot swear positively.

"Do you know whether it has any white feet or not? I cannot swear positively, it may have.

"Then if it had not been for this mark you could not tell whether this was your hog or not? Well, I would not be able to swear positively it was mine without the mark.

"How much would this hog weigh the last time you saw it before it disappeared? Oh, 80 or 90 pounds, maybe a little bit more.

"How much did it weigh in October when you say you found it in this man's pen? Just guessing, I would judge it would weigh 125 pounds.

"Did you have any talk with Mrs. Thompson about the hog? She came down to the pen and said she had washed for it at John Starnes when it was a little bit of a pig, but she told William to give it up."

James Gable testified:

"I saw a sow in the pen at William Thompson's place, and it looked like one I had seen before up on the mountain above my place. It had Dave Whitmore's mark, two splits and a crop off of each ear."

William Scott testified:

"I saw a sow in the pen at the defendant's place last fall; it was Dave Whitmore's hog. The last time I saw that hog before I saw it in that pen was along in July some time."

On cross-examination the following questions were asked and answered:

"Who were you renting from last year? Dave Whitmore. He is my brother-in-law. He told me there was a hog down at Thompson's. He said he had found his hog.

"The only way you identified this hog as Whitmore's is from the mark and the general appearance, you say? Yes,

sir; from the mark and general appearance I think it is his hog.

"It was in a pen between the house and the road at Thompson's place? Yes, sir."

The state rested; the defendant demurred to the evidence, and moved to dismiss for the reason that the evidence is insufficient to establish the charge in the information. Overruled. Exception allowed.

For the defense Victoria Thompson testified:

"I had this hog in a pen under a plum tree in the yard. I got it from John Starnes; I wash for him, and I paid for this hog that way. I had this hog going on 2 years when Mr. Whitmore came over and claimed it. It would get out and follow the children to school, and they would bring it back. It got out and went to Mr. Baughman's place. When Mr. Whitmore looked at the hog, he says, 'Don't you want to sell it?' and Mr. Thompson said, 'No; it belongs to the old lady.'"

Johnson Thompson testified:

"I am not related to the defendant. The first time I saw that hog was when the defendant went down to John Starnes and brought it home. It was a small pig. I and George Cook were pulling corn at John Starnes when he came and got it. Thompson's wife paid for it by washing. That was two years ago. I have seen it after that often when I would happen up at his place. That is the only hog I saw there for 2 years. The mark on the hog is William Thompson's. He has used this mark 30 or 35 years."

John Ford testified:

"I am acquainted with the stock mark of William Thompson. He has used that mark about 35 years to the best of my knowledge. Mr. Chestnut and Mr. Whitmore use the same mark."

Walter Bean testified:

"I have known the defendant about 25 years. When I first saw that hog to pay any attention to it was last Thanks-

giving a year ago. The mark is old man Thompson's. He has used it 20 years that I know of. I saw the same mark on some of Mr. Whitmore's hogs.''

H. R. Vanslyk testified:

''I farmed some land on the defendant's place. I know the hog he had last winter a year ago. I first saw it at my place. Mrs. Thompson was there, and it followed her home. Last winter it was at my place fairly often, and I saw it in the pen when I was picking cotton down there.''

P. W. Baughman testified:

''I live about a mile from the defendant; roasting ear time I took up a hog. My son told me Mrs. Thompson had one that was gone, so I went to Mr. Thompson, and he told me he had one gone. He described it pretty well, and said if it was his the bush of the tail was cut off. We went on down, and when we got close to the hog I saw the bush of the tail was gone. I had not noticed that before. He said it was his, and he drove it home with the rope that I had tied it to a tree with.''

As a witness in his own behalf, William Thompson testified:

''My age is 54. I have been living right on Four Mile Branch all my days. The hog that Mr. Whitmore claims belongs to my wife. She got it from John Starnes. When it was a pig its tail froze off. I have never been arrested before being arrested on this charge.''

J. J. Bruce testified, as an attorney for the defendant:

''I filed a praecipe for his witnesses, among others, John Starnes. I called Mr. Starnes up over the phone last night, and he told me he did not get it; he said he was sick in bed and could not come. I had occasion to visit Mr. Thompson's home several times last year. I was there every three or four weeks. I noticed a black-spotted sow in a hogpen in the yard. I happened to be at Mr. Thompson's house the day that Mr. Whitmore came there. He looked in the pen and rode off. Near sundown he returned with an officer; said

he wanted to arrest Mr. Thompson and replevin the hog. I asked him how did he know that it was his hog. He said by the marks. I asked him if he had no other way to identify the hog aside from the marks, and he said, 'No.' "

On cross-examination the following questions were asked and answers given:

"You have seen this man Starnes since this controversy arose, haven't you? Yes, sir.

"I will ask you if it is not a fact that Starnes advised you that he had sold them a pig 3 years ago? I asked him did he ever sell this man a hog, and he told me he sold his wife a pig two years ago."

The first assignment is that the court erred in denying a continuance.

The record shows that upon the calling of the case for trial the defendant's counsel announced that he was not ready for trial on account of the absence of certain witnesses for which he had caused subpoenas to be issued and placed in the hands of the proper officer, and that no return had been made.

"The Court: It looks to me like the defendant has used all the diligence the law requires.

"Mr. Bruce: It may be that the witnesses will arrive on this motor; if they do, we are ready for trial. (Mr. Powell, cocounsel, arrives.)

"The Court: Mr. Powell, do you know whether or not your witnesses came on the motor?

"Mr. Powell: They did, your honor; at least some of them.

"The Court: Are you ready for trial?

"Mr. Powell: My cocounsel says he is ready to go to trial with those witnesses."

Thereupon the trial proceeded. Thus it appears that the first assignment is without merit.

Another assignment is that the verdict of the jury was contrary to the law and the evidence. Ordinarily, whether there is evidence to warrant a conviction is a question for the jury. However, under our Code of Criminal Procedure, it is the duty of the court, where it deems the evidence insufficient to warrant a conviction, to advise the jury to acquit. Section 5896, Rev. Laws. The court may undoubtedly do this of its own motion, and the defendant may present to the court his right to acquittal, as a matter of law, under this section. But the defendant is not confined to this formula, or to any form of words, in presenting to the court his right to be acquitted. All that is necessary is that in some intelligible form there shall be presented to the court, for its ruling and decision, the question that there is no evidence for the jury, or not sufficient evidence upon which to base a conviction.

In view of the very weak and unsatisfactory character of the testimony relied upon to establish the corpus delicti, and, considering the undisputed facts, and that the witnesses on the part of the defendant were in no way attempted to be impeached, we think the court below should have advised the jury to acquit the defendant. In our opinion the evidence fails so far to support the verdict that the necessary inference is that the verdict was the result of passion or prejudice. Because the evidence does not sustain the conviction, the judgment is reversed.

MATSON and BESSEY, JJ., concur.